**Larry Carl CHOATES, Plaintiff,**

**v.**

**Donald E. POWELL, Chairman, Federal Deposit Insurance Corporation, Defendant.**

**Civil Action No. 01–0968 (AK).**

United States District Court, District of Columbia.

June 5, 2003.

David H. Shapiro, Swick & Shapiro, Heidi Rhodes Burakiewicz, Woodley & McGillivary, Washington, DC, for plaintiff.

Lynn M. Powalski, Federal Deposit Insurance Corporation Legal Division, Peter David Blumberg, U.S. Attorney's Office, Thomas J. Feeney, William S. Jones, Federal Deposit Insurance Corporation Litigation Division, Washington, DC, for defendant.

### *MEMORANDUM OPINION*

KAY, United States Magistrate Judge.

Pending before the Court is Defendant's Motion for Summary Judgment ("Motion") [35, 37], Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opposition") [46], Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Reply") [49], and Plaintiff's Sur–Reply to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Sur–Reply") [52]. A hearing was held on this Motion on April 16, 2003. Upon consideration of the Motion, Opposition, Reply, and Sur–Reply and the parties' oral arguments, and for the reasons set forth below, the Court has determined

that Defendant's Motion for Summary Judgment [35] shall be **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

## I. BACKGROUND

### A. The Plaintiff's Employment History at the Federal Deposit Insurance Corporation.

The Plaintiff, Larry Carl Choates, is an African American man who has been employed by the Federal Deposit Insurance Corporation ("FDIC") since 1996. (Motion at 2.) The Plaintiff was previously employed by the Resolution Trust Corporation ("RTC") which was created in response to the savings and loan crisis in the late 1980s and which was dissolved on December 31, 1995 at which time the FDIC absorbed and integrated the RTC into the FDIC. (*Id.*) The Plaintiff began working at the RTC in 1991 as Chief, Accounting & Operational Control Unit in the Division of the Chief Financial Officer (Grade 14). (*Id.* at 2–3 and Ex. 1 Appointment Affidavit.) The Plaintiff still held this position immediately before the RTC was dissolved at the end of 1995. (*Id.* at 2–3 and Ex. 2 Notification of Personnel Action.) At the FDIC, the Plaintiff became a Senior Accountant in the Internal Review Branch ("IRB")[1] in the Division of Finance ("DOF"), maintaining the same Grade 14 pay and benefits. (*Id.* at 3 and Ex. 2 Notification of Personnel Action.) The Plaintiff currently holds this same title at the FDIC. (*Id.* at 3.)

### B. The Creation and Staffing of the Federal Deposit Insurance Corporation's Office of Internal Control Management.

The FDIC division in which the Plaintiff worked, the IRB, had three sections that were responsible for (1) audit coordination; (2) corporate compliance with the Chief Financial Officer's Act; and (3) review and process engineering. (*Id.*) Although there were permanent staff assigned to these sections, most IRB staff, including the Plaintiff, were assigned to the IRB's Professional Staff Group which supported these sections as needed. (*Id.* at 3–4.) At the time, J. Russell Cherry was the Associate Director and head of the IRB. (*Id.* at 3.)

In early 1996, the Office of Internal Control Management ("OICM") was created, outside the Division of Finance, which took over some of the functions formerly performed by IRB. (*Id.* at 4.) Vijay Deshpande was selected to be the Director of OICM and he reported directly to the FDIC's Chief Financial Officer. (*Id.*) The Plaintiff and other IRB employees were temporarily assigned to work on OICM matters until permanent staff was hired. (*Id.*)

### (1) The Vacancy Postings for the Office of Internal Control Management Supervisory Management Positions.

The OICM was staffed using a "top-down" approach beginning with the supervisory management positions. (*Id.*) In June 1996, the FDIC posted vacancy announcements for four supervisory Grade 15 management positions which were open to permanent FDIC employees nationwide. (*Id.* at 4–5.) Consistent with the FDIC's procedures, the FDIC's Personnel Services Branch ("PSB") reviewed all submitted applications and determined which applicants satisfied the basic qualifications for the positions. (*Id.* at 5 and Ex. 40 Aff.

---

1. The Internal Review Branch ("IRB") was later renamed the Management Services Branch ("MSB"). (Motion at 10.)

of Laverne G. Coleman ("Coleman Aff.") at 2.) The PSB then created two rosters: (1) the reassignment-eligible roster and (2) the promotion-eligible roster. (*Id.* at 5 and Ex. 40 Coleman Aff. at 2.) The reassignment-eligible roster identified all the qualified applicants who currently or previously held a permanent federal job at or above Grade 15 which was the level of the vacancies announced; however, the roster did not list the permanent grade levels of the candidates. (*Id.* at 5 and Ex. 40 Coleman Aff. at 2; *id.* at 7 n. 10.) The rest of the qualified candidates were working at either the Grade 14 level or had obtained temporary promotions to the Grade 15 level. (*Id.* at 6.) Because there was a large number of these candidates, the PSB had these applications evaluated by a rating panel that identified a limited number of the best-qualified applicants from this category. (*Id.* at 6 and Ex. 40 Coleman Aff. at 2.) These best-qualified candidates were listed in alphabetical order on the promotion-eligible roster and the roster did not include the rating panel's ranking of the candidates. (*Id.* at 6, 7 n. 10.) The selecting official then received a copy of both the reassignment-eligible roster and the promotion-eligible roster at the same time. (*Id.* at 6.)

### (a) Vacancy Announcement Number 96–C–624

The position of Supervisory Management Analyst, Audit Follow-up and Resolutions Section was posted in Vacancy Announcement Number 96–C–624. (*Id.* at 6 and Ex. 7 Position Vacancy Announcement.) Forty-nine FDIC employees, including the Plaintiff, applied for this position. (*Id.* at 6 and Ex. 14 List of Applicants.) The PSB concluded that twenty-eight of the applicants met the basic qualifications for the position. (*Id.*) Five of the qualified applicants were listed on the reassignment-eligible roster.

(*Id.* at 6 and Ex. 15 Memorandum to Selecting Official from Personnel Staffing Specialist.) The remaining applicants were assessed by a rating panel that identified the six best-qualified candidates from this category and these applicants were listed on the promotion-eligible roster in alphabetical order. (*Id.* at 6–7 and Ex. 16 Roster of Eligibles.)

### (b) Vacancy Announcement Number 96–C–625

The position of Supervisory Management Analyst, Internal Control Operations Section was posted in Vacancy Announcement Number 96–C–625. (*Id.* at 6 and Ex. 8 Position Vacancy Announcement.) Fifty-three FDIC employees, including the Plaintiff, applied for this position. (*Id.* at 7 and Ex. 17 List of Applicants.) The PSB concluded that forty-one of the applicants met the basic qualifications for the position. (*Id.*) Eight of the qualified applicants were listed on the reassignment-eligible roster. (*Id.* at 7 and Ex. 11 Memorandum to Selecting Official from Personnel Staffing Specialist.) The remaining applicants were assessed by a rating panel that identified the eight best-qualified candidates from this category and these applicants were listed on the promotion-eligible roster in alphabetical order. (*Id.* at 7 and Ex. 12 Roster of Eligibles.)

### (c) Vacancy Announcement Number 96–C–626

The position of Supervisory Management Analyst, Internal Control Policies Section was posted in Vacancy Announcement Number 96–C–626. (*Id.* at 7 and Ex. 9 Position Vacancy Announcement.) Forty-nine FDIC employees, including the Plaintiff, applied for this position. (*Id.* at 7 and Ex. 18 List of Applicants.) The PSB concluded that thirty of the applicants met the basic qualifications for the position. (*Id.* at 7–8 and Ex. 18 List of Applicants.)

Seven of the qualified applicants were listed on the reassignment-eligible roster. (*Id.* at 8 and Ex. 19 Memorandum to Selecting Official from Personnel Staffing Specialist.) The remaining applicants were assessed by a rating panel that identified the six best-qualified candidates from this category and these applicants were listed on the promotion-eligible roster in alphabetical order. (*Id.* at 8 and Ex. 20 Roster of Eligibles.)

### (d) Vacancy Announcement Number 96–C–627

The position of Supervisory Management Analyst, Audit Committee Liaison and Support was posted in Vacancy Announcement Number 96–C–627. (*Id.* at 8 and Ex. 10 Position Vacancy Announcement.) Forty-nine FDIC employees, including the Plaintiff, applied for this position. (*Id.* at 8 and Ex. 21 List of Applicants.) The PSB concluded that forty of the applicants met the basic qualifications for the position. (*Id.*) Seven of the qualified applicants were listed on the reassignment-eligible roster. (*Id.* at 8 and Ex. 22 Memorandum to Selecting Official from Personnel Staffing Specialist.) The remaining applicants were assessed by a rating panel that identified the eight best-qualified candidates from this category and these applicants were listed on the promotion-eligible roster in alphabetical order. (*Id.* at 8 and Ex. 23 Roster of Eligibles.)

### (2) *The Hiring Process for the Office of Internal Control Management Supervisory Management Positions.*

The Director of OICM, Vijay Deshpande, was the selecting official for the four Supervisory Management Analyst positions. (*Id.* at 8.) Because the FDIC was being downsized, senior management wanted to ensure that the FDIC retained experienced employees who were highly qualified. (*Id.* at 8–9 and Ex. 5 Aff. of Vijay G. Deshpande ("Deshpande Aff.") at 3.) In keeping with this goal, Mr. Deshpande decided to first consider all the candidates on the reassignment-eligible rosters. (*Id.* at 8–9 and Ex. 5 Deshpande Aff. at 3.) The reassignment- and promotion-eligible rosters were forwarded to Mr. Deshpande on August 9, 1996. (*Id.* at 7–8.) Mr. Deshpande reviewed the paper applications for each reassignment eligible candidate and then proceeded to interview each reassignment eligible candidate. (*Id.* at 8–9 and Ex. 5 Deshpande Aff. at 3.) For three of the four Supervisory Management Analyst positions, Mr. Deshpande found exceptionally qualified candidates on the reassignment-eligible roster and made his selection from this roster. (*Id.*) Mr. Deshpande did not consider or interview any of the candidates listed on the promotion-eligible rosters for these three positions. (*Id.* at 9 and Ex. 5 Deshpande Aff. at 3–4.)

### (a) Vacancy Announcement Number 96–C–624

Mr. Deshpande selected Howard Furner to fill the position of Supervisory Management Analyst, Audit Follow-up and Resolutions Section that was posted in Vacancy Announcement Number 96–C–624. (*Id.* at 9, 17 and Ex. 15 Memorandum Indicating Selection.) According to Mr. Deshpande, he selected Mr. Furner for this position because Mr. Furner had recent, significant experience in auditing and coordinating audits. (*Id.* at 17 and Ex. 6 Deposition of Vijah Deshpande ("Deshpande Depo.") at 28–29.) Mr. Furner was coordinating audits and the audit process for the FDIC in Chicago which was work similar to that required for the position of Supervisory Management Analyst, Audit Follow-up and Resolutions Section. (*Id.* at 17 and Ex. 6 Deshpande Depo. at 28–29.) Although Mr. Furner was not a Certified Public Accountant ("CPA"), he was a Certified Fraud

Examiner; this training enables individuals to identify fraud, abuse, and waste and Mr. Deshpande believed that this type of investigative background was helpful for this position. (*Id.* at 17 and Ex. 6 Deshpande Depo. at 29–30.) Mr. Deshpande also considered it favorable that Mr. Furner had strong experience in working with regional managers in coordinating audits and the audit process. (*Id.* at 17 and Ex. 6 Deshpande Depo. at 28–29.)

(b) Vacancy Announcement
Number 96–C–626

Mr. Deshpande selected Kenneth Jones to fill the position of Supervisory Management Analyst, Internal Control Policies Section that was posted in Vacancy Announcement Number 96–C–626. (*Id.* at 9, 17–18 and Ex. 19 Memorandum Indicating Selection.) Beyond issuing new internal control policies, procedures, and manuals, this position entailed training other FDIC managers. (*Id.* at 17–18 and Ex. 6 Deshpande Depo. at 38.) Mr. Jones had been a senior manager in an FDIC office and had been responsible for preparing internal control policy and procedure manuals. (*Id.* at 17–18 and Ex. 6 Deshpande Depo. at 40.) Mr. Jones also had experience in training. (*Id.* 18 and Ex. 6 Deshpande Depo. at 39.)

(c) Vacancy Announcement
Number 96–C–627

Mr. Deshpande selected Michael MacDermott to fill the position of Supervisory Management Analyst, Audit Committee Liaison and Support that was posted in Vacancy Announcement Number 96–C–627. (*Id.* at 9, 18 and Ex. 22 Memorandum Indicating Selection.) This position involved working with all the FDIC's divisions and offices and interacting with high-level managers and executives. (*Id.* at 18 and Ex. 6 Deshpande Depo. at 34.) Mr. Deshpande determined that Mr. MacDermott's experience working in different lo-

cations and in different positions prepared him for the liaison-type role required in this position. (*Id.* at 18 and Ex. 6 Deshpande Depo. at 34–35.) Mr. MacDermott was "very familiar with all the key executives in the corporation and had handled himself quite well." (*Id.* at 18 and Ex. 6 Deshpande Depo. at 35.)

(d) Vacancy Announcement
Number 96–C–625

With respect to the position of Supervisory Management Analyst, Internal Control Operations Section, which was posted in Vacancy Announcement Number 96–C–625, after interviewing the candidates from the reassignment-eligible roster, Mr. Deshpande concluded that none of these candidates was exceptionally well-qualified for this position. (*Id.* at 9 and Ex. 5 Deshpande Aff. at 4.) As a result, Mr. Deshpande reviewed the paper applications and interviewed all of the applicants on the promotion-eligible roster, including the Plaintiff. (*Id.* at 9 and Ex. 5 Deshpande Aff. at 4.) Based on his evaluation of these applicants, Mr. Deshpande concluded that Corinne Watts was the best qualified candidate and he selected her for this position. (*Id.* at 9–10, 18 and Ex. 5 Deshpande Aff. at 4–5.) Mr. Deshpande found that of the candidates on the promotion-eligible roster, Ms. Watts was his top choice because she was "clearly the most qualified." (*Id.* at 20 and Ex. 5 Deshpande Aff. at 5.) Ms. Watts had an M.B.A. with specialization in internal controls and had more broad program evaluation work. (*Id.* at 19–20 and Ex. 5 Deshpande Aff. at 4.) Ms. Watts had also demonstrated an ability to develop working relationships with people outside her division and an interest and ability to work outside the box. (*Id.* at 19–20 and Ex. 6 Deshpande Depo. at 81–82.) In comparing the performance evaluations of Ms. Watts and the Plaintiff, Mr. Deshpande found that Ms. Watts had "much

higher scores on working relations with other people, peers ... [and] communication skills." (*Id.* at 19–20 and Ex. 6 Deshpande Depo. at 81–82.)

### C. The Hiring Process for the Management Services Branch Position of the Chief, Review and Visitation Section.

The Internal Review Branch was renamed the Management Services Branch ("MSB") and, at the same time, the division formerly known as the Review and Process Reengineering Section was renamed the Review and Visitation Section. (*Id.* at 10.) The former head of the Review and Visitation Section was transferred and Robert Keefer was placed in this supervisory position on an acting basis. (*Id.* at 10–11.) The position of Chief, Review and Visitation Section, Grade 15, in the DOF, was posted in Vacancy Announcement Number 96–A–1034 and was open to permanent FDIC employees nationwide. (*Id.* at 11 and Ex. 30 Vacancy Announcement.) Thirty-four FDIC employees, including the Plaintiff, applied for this position. (*Id.* at 11 and Ex. 31 List of Applicants.) As with the vacancies in the OICM, the PSB reviewed all submitted applications and determined which applicants satisfied the basic qualifications for the position. (*Id.* at 11 and Ex. 31 List of Applicants.) The PSB concluded that all thirty-four of the applicants met the basic qualifications for the position. (*Id.* at 11 and Ex. 31 List of Applicants.) Twelve of the qualified applicants were listed on the reassignment-eligible roster. (*Id.* at 11 and Ex. 32 Memorandum to Selecting Official from Personnel Staffing Specialist.) The remaining applicants were assessed by a rating panel that identified the nine best-qualified candidates from this category and these applicants were listed on the promotion-eligible roster in alphabetical order. (*Id.* at 11–12 and Ex. 33 Roster of Eligibles.) The selecting official then received a copy of both the reassignment-eligible and the promotion eligible rosters. (*Id.* at 12.)

The selecting official for the position of Chief, Review and Visitation Section, was J. Russell Cherry, the Associate Director of the MSB. (*Id.* at 12 and Ex. 3 Affidavit of Joseph Russell Cherry ("Cherry Aff.") at 1–2.) In Mr. Cherry's view, this position was the most sensitive of the MSB supervisory positions because it requires an individual to perform the role of an auditor and consultant to the division in an effective, but non-threatening way in order to evaluate the controls and weaknesses in the division. (*Id.* at 20–22 and Ex. 3 Cherry Aff. at 4.) In order to accomplish this, beyond technical experience, Mr. Cherry was looking for a candidate with "[e]xtraordinary communications skill and rapport with the reviewed, supervisors, and staff" and an ability to work through processes, while communicating and providing empathy. (*Id.* at Ex. 3 Cherry Aff. at 4.)

In reviewing the applications of the eligible candidates, Mr. Cherry focused his selection on those candidates in the Washington, DC office of the DOF because of "downsizing and relocation guidance" conveyed to him by the division's management. (*Id.* at Ex. 3 Cherry Aff. at 10–11.) There were no applicants on the reassignment-roster from the Washington, DC office. (*Id.* at Ex. 32 Memorandum to Selecting Official from Personnel Staffing Specialist.) There were three primary candidates on the promotion-eligible roster which Mr. Cherry focused on: Robert Keefer, who was the acting chief, the Plaintiff, and John Zacepillo. (*Id.* at Ex. 3 Cherry Aff. at 10–11.) Based on a review of the paper applications and his familiarity with the candidates, Mr. Cherry selected Mr. Keefer for the position. (*Id.* at 12 and Ex. 3 Cherry Aff. at 5–6, 11.) In

evaluating the applicants, Mr. Cherry considered the criteria listed in the Vacancy Announcement which were:

1. Knowledge of auditing concepts and procedures of internal control systems and techniques.

2. Knowledge of and ability to apply project management principles to projects, processes and functions employing DOF staff, detailees and contractors.

3. Ability to effectively deal with executives, managers and supervisors at all levels in the FDIC.

4. Ability to communicate effectively, both orally and in writing, on management, technical and procedural issues.

(*Id.* at 20–21 and Ex. 3 Cherry Aff. at 5.) Mr. Cherry found that the Plaintiff and Mr. Keefer were about equally rated on the first and second criteria. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5.) He also determined that experience was most important for the position and that both the Plaintiff and Mr. Keefer had lots of experience. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5.) The Plaintiff had a CPA and CIA certification and Mr. Keefer had an M.B.A., although none of these credentials was required for the position. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5.)

In Mr. Cherry's view, strong communication skills were the essence of the third and fourth criteria and in his judgment, Mr. Keefer was "clearly a better communicator" than the Plaintiff. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5.) Although both candidates adequately represented themselves in the application for the position, based on Mr. Cherry's work experience and knowledge of the two candidates he concluded that Mr. Keefer was a better communicator. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5.) Mr. Keefer regularly advised Mr. Cherry about the status and progress of his work and, according to informal feedback from staff, Mr. Keefer was a better communicator. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5–6.) In contrast, Mr. Cherry expressed concerns about the Plaintiff's failure to keep him adequately informed about the Plaintiff's work when he was detailed to OICM. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5.) In addition, with respect to audit coordination, Mr. Cherry found that although communicating context is critical in visitation and review activity, the Plaintiff did not always provide the necessary context for the issues on which he was reporting. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5–6.) Mr. Cherry selected Mr. Keefer for the position.

**D. The Procedural History of the Pending Case.**

The Plaintiff was informed that he was not selected for the three positions announced in Vacancy Announcement Numbers 96–C–624, 96–C–626, and 96–C–627 in late September or early October of 1996. (*Id.* at 10.) He was then informed that he was not selected for the position announced in Vacancy Announcement Number 96–C–625 at the end of October 1996. (*Id.*) The Plaintiff contacted an EEO Counselor on November 1, 1996 and filed a formal complaint alleging racial discrimination on January 29, 1997. (*Id.*) The Plaintiff was informed that he was not selected for the position announced in Vacancy Announcement Number 96–A–1034 in January 1997 and he contacted an EEO Counselor on January 29, 1997. (*Id.* at 12.) The Plaintiff filed a formal complaint of racial discrimination regarding this non-selection on May 27, 1997. (*Id.*)

On May 8, 2001, the Plaintiff filed the instant law suit, claiming racial discrimination based on his non-selection for the five positions discussed above. (Complaint [1] at 8.) On November 7, 2001, the case was assigned to the undersigned United States Magistrate Judge with the consent of all

parties. (Consent to Proceed Before a United States Magistrate dated April 9, 2002.) The parties completed discovery in this matter and the Defendant has filed the Motion for Summary Judgment [35, 37] now pending before the Court. The Motion seeks judgment on all claims on grounds that Plaintiff has failed to establish that his non-selection for the five positions was the result of racial discrimination. (Motion at 16–29.)

## II. LEGAL STANDARDS

### A. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment if the pleadings and evidence show that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, the nonmoving party must present more than a "scintilla of evidence" and must come forward with specific facts that would enable a reasonable jury to find in its favor. *Id.* at 252, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the evidence presented by the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

In the context of discrimination cases, summary judgment should be approached with special caution because of the difficulty of proving discriminatory intent and disparate treatment. *Morgan v. Federal Home Loan Mortgage Corp.*, 172 F.Supp.2d 98, 104 (D.D.C.2001) ("While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial.") (quoting *Calhoun v. Johnson*, Civil No. 95–2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998)) (citation omitted); *Ross v. Runyon*, 859 F.Supp. 15, 21–22 (D.D.C.1994). However, this does not eliminate the use of summary judgment in discrimination cases. *See, e.g., Clark County School District v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (finding that District Court's grant of summary judgment in Title VII case was proper and overturning Court of Appeals decision that reversed District Court); *Forkkio v. Powell*, 306 F.3d 1127, 1132 (D.C.Cir.2002) (upholding grant of summary judgment for defendant in Title VII case alleging racial discrimination and retaliation); *Brown v. Brody*, 199 F.3d 446, 448 (D.C.Cir.1999) (upholding grant of summary judgment for defendant in Title VII suit alleging racial and gender discrimination and retaliation). Summary judgment is not a "disfavored procedural shortcut," but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case. *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548.

### B. Legal Standard for Title VII Claims.

In *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established a burden-shifting framework that governs the analysis of racial discrimination and retaliation claims. *See, e.g., Aka v. Washington Hospital Center*, 156 F.3d 1284, 1288–89 (D.C.Cir.1998); *Richard v. Bell Atlantic Corp.*, 165 F.Supp.2d 1, 6–7 (D.D.C.2001); *Hastie v. Henderson*, 121 F.Supp.2d 72, 78 (D.D.C.2000). The plaintiff bears the initial burden of proving a *prima facie* case of discrimination by a

preponderance of the evidence. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Then the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the action. *Id.* If the defendant meets this burden, then the presumption of discrimination is rebutted and drops from the case. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The plaintiff must then show that the articulated reason was a pretext and that the actual reason was discriminatory. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. At all times, the ultimate burden of persuasion remains with the plaintiff to prove that she was subjected to discrimination. *Hicks,* 509 U.S. at 507–08, 113 S.Ct. 2742.

■ The requirements for a *prima facie* case of racial discrimination are flexible and vary depending on the type of case. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. Here, to establish a claim of discrimination for non-selection, the Plaintiff must prove that (1) he is a member of a protected class; (2) he was qualified for a position the employer sought to fill; (3) he was not selected by the employer; and (4) the employer continued to seek applicants with plaintiff's qualifications. *Id.* at 802, 93 S.Ct. 1817; *Hastie,* 121 F.Supp.2d at 78; *Stella v. Mineta,* 284 F.3d 135, 144–45 (D.C.Cir.2002) (citing *Brown v. Brody,* 199 F.3d at 452).

## III. ANALYSIS

**A. The Plaintiff has Failed to Create a Triable Issue Regarding His Non–Selection for the Office of Internal Control Management Positions; Consequently, the Defendant is Entitled to Summary Judgment on these Claims.**

*(1) The Plaintiff Has Established a* Prima Facie *Case.*

The Plaintiff has established a *prima facie* case of racial discrimination, creating a presumption of discrimination. It is uncontroverted that the Plaintiff, as an African–American man, is a member of a protected class and that he was qualified for the four OICM positions for which he applied, but that he was not selected. (Motion at 6–10; Opposition at 11.) Under the *McDonnell Douglas* framework set forth above, the burden then shifts to the Defendant to rebut the *prima facie* case by coming forward with a legitimate, non-discriminatory reason for its personnel decision. The FDIC has satisfied its burden to articulate a legitimate, non-discriminatory reason for not selecting the Plaintiff for these positions and these reasons are amply supported by the record.

*(2) The Defendant Has Offered Legitimate, Non–Discriminatory Reasons For the Plaintiff's Non–Selection.*

■ With respect to the positions announced in Vacancy Announcement Numbers 96–C–624, 96–C–626, and 96–C–627, the FDIC has provided a detailed account of the hiring process employed by Mr. Deshpande, the selecting official for the OICM supervisory positions. There were agency-wide concerns regarding downsizing, a possible reduction in force, and the absorption of the RTC by the FDIC that had occurred at the end of 1995. (Motion at 2, 8–9 and Ex. 5 Deshpande Aff. at 3.) Senior management officials strongly encouraged efforts to retain highly qualified and experienced employees whenever possible. (*Id.* at 8–9 and Ex. 5 Deshpande Aff. at 3.) In light of these concerns, Mr. Deshpande began the selection process by first considering the candidates on the reassignment-eligible roster. (*Id.*) He reviewed the paper applications for these candidates and then conducted interviews of all of the candidates on the reassignment eligible-roster. (*Id.*)

For three of the OICM supervisory positions, Mr. Deshpande found exceptionally qualified candidates among the applicants on the reassignment-eligible roster and made his selection from this pool of candidates. (*Id.*) Because he found these exceptionally well-qualified candidates on the reassignment-eligible roster, he concluded his efforts to fill these positions and did not consider any of the applicants on the promotion-eligible roster, which included the Plaintiff. (*Id.* at 9 and Ex. 5 Deshpande Aff. at 3–4.) Specifically, he selected Mr. Furner for the position announced in Vacancy Announcement Number 96–C–624, he selected Mr. Jones for the position announced in Vacancy Announcement Number 96–C–626, and he selected Mr. MacDermott for the position announced in Vacancy Announcement Number 96–C–627. (*Id.* at 8–9 and Ex. 5 Deshpande Aff. at 3.)

With respect to the fourth supervisory position in OICM, in the Internal Control Operations Section, Mr. Deshpande followed the same approach that is detailed above. However, after considering the paper applications and interviews of the reassignment-eligible candidates, Mr. Deshpande concluded that none of these applicants was exceptionally well-qualified for the position. (*Id.* at 9 and Ex. 5 Deshpande Aff. at 4.) Therefore, Mr. Deshpande went on to consider the applicants on the promotion-eligible roster. (*Id.*) He reviewed the paper applications and conducted interviews of these candidates, including the Plaintiff. (*Id.*) Based on his assessment of the candidates, Mr. Deshpande concluded that Corrine Watts was the best qualified candidate and he selected her for this position. (*Id.* at 9–10, 18 and Ex. 5 Deshpande Aff. at 4.) Not only did Ms. Watts have an M.B.A. with a specialization in internal controls, the section she was selected to oversee, but she also had broad program evaluation experience, an ability to develop working relationships, even outside her division, and an ability to work outside the box. (*Id.* at 19–20 and Ex. 6 Deshpande Depo. at 81–82.) Her strong ability to form working relationships and communicate well was reflected in the high scores she received on her performance evaluations. (*Id.*)

*(3) The Plaintiff Has Failed to Present Evidence that the Defendant's Offered 0Reasons Are a Pretext for Discrimination.*

 Because the Defendant has satisfied the burden of coming forward with a legitimate, non-discriminatory reason for the Plaintiff's non-selection for the four OICM positions, the presumption of discrimination created by the Plaintiff's *prima facie* case drops out and the burden shifts back to the Plaintiff to present evidence indicating that the offered reason is a pretext for unlawful discrimination. The Plaintiff has failed to satisfy this burden. As the Supreme Court has explained, a legitimate, non-discriminatory reason offered by a defendant "cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks,* 509 U.S. at 515, 113 S.Ct. 2742. In this case, the Plaintiff has failed to prove either.

To begin with, the Plaintiff's claims of discrimination are based on speculation. With respect to the three OICM positions that were filled with reassignment-eligible candidates, the Plaintiff appears to believe that he was the only candidate on the promotion eligible-roster who did not have an opportunity to interview. (Motion at 25–26.) This is incorrect. (*Id.*) In his deposition, the Plaintiff explained the basis for his belief that he was discriminated against, stating that he was only interviewed for one of the four OICM positions

and that all the white candidates were interviewed. (*Id.* at 25 and Ex. 37 Deposition of Larry Choates ("Choates Depo.") at 56–58.) He argued that because he was the only African–American person on the promotion-eligible roster and he did not get interviewed, then it was because of his race. (*Id.*) When it was suggested that he was not interviewed because he was a Grade 14 and on the promotion-eligible rather than reassignment-eligible roster, he rejected this explanation and said that "to just ignore the one black person" on the promotion-eligible roster is discrimination. (*Id.*)

The Plaintiff's disappointment at not having the opportunity to interview for these positions is understandable; however, that does not mean it is discriminatory. The record evidence clearly establishes that all the promotion-eligible candidates were treated the same, without regard to their race.[2] (*See, e.g., id.* at 25 n. 13 (stating that Plaintiff's supervisor, a white man was not interviewed for these positions because he was only a temporary Grade 15 and therefore was only listed on the promotion-eligible roster).) As a Grade 14 and promotion-eligible, the Plaintiff was not similarly situated to the reassignment-eligible candidates who were interviewed for these OICM positions.

 (a) The Legitimate, Non–Discriminatory Reasons Offered by the Defendant Are Not Inconsistent.

■■■ The Plaintiff urges the Court to find that the proffered reasons were a pretext by suggesting there were inconsistencies in the Defendant's explanation of the hiring process. Plaintiff notes that Mr. Deshpande stated he was interested in finding the best candidate. Plaintiff also points out that Mr. Deshpande looked first to select a candidate from the reassign-ment-eligible roster. This, Plaintiff contends, is inconsistent with a sincere effort to find the best candidate since that candidate could have been on the promotion-eligible roster (indeed Plaintiff contends that it was himself and he was on the promotion-eligible roster) and would be excluded from consideration. (Opposition at 12–13.)

The Court does not find this argument persuasive. To begin with, Mr. Deshpande has set out in great detail the hiring procedure he employed and the reasons for it. He then followed that procedure for all four positions for which he was the selecting official. Plaintiff contends the process is suspect because it does not follow the suggestion in the PSB Roster of Eligibles that states "[t]o assure full consideration, if one candidate is interviewed, every reasonable effort should be made to interview all candidates." (Opposition at 6 and Motion at Ex. 16 Roster of Eligibles.) First. the Court notes that the roster form also instructs the selecting official that the candidates listed "*may* be considered for the subject position." (Motion at Ex. 16 Roster of Eligibles (emphasis added).) Second, there is no indication of a requirement that the promotion eligible candidates *must* be interviewed; nor is there any reference made to the reassignment eligible roster and how these candidates should be considered in relation to each other. (*Id.* at Ex. 16 Roster of Eligibles and Ex. 15 Memorandum to Selecting Official from Personnel Staffing Specialist.)

With respect to the consistency of Mr. Deshpande's approach, he followed the same process for each selection. For three of the positions he found an excellent candidate among the reassignment-eligible applicants and made his selection from this group. As the Defendant points

---

**2.** In fact, during his deposition, the Plaintiff described his conversations with another promotion-eligible candidate, a white man, who was disappointed at not being selected for the OICM positions. (*Id.* at 25–26 and Ex. Choates Depo. at 22–23.)

out, the Plaintiff has not shown that he was treated differently than similarly situated non-minority applicants. (Reply at 8.) In fact, Mr. Deshpande did not consider *any* of the candidates on the promotion-eligible roster for these three positions because his search concluded after finding an excellent candidate on the reassignment-eligible roster. For the fourth position, when he was unable to find an excellent candidate among the reassignment-eligible applicants, he proceeded to consider and interview *all* of the candidates on the promotion-eligible roster and selected the individual he determined to be the best candidate from that group.

(b) The Plaintiff Failed to Present Evidence Showing that Mr. Deshpande's Reasons Are a Pretext for Discrimination.

█ The Plaintiff asserts that Mr. Deshpande's proffered concerns about downsizing and retaining qualified, experienced staff at the FDIC were an after-the-fact excuse to cover up a discriminatory attempt to avoid considering the Plaintiff for these positions. (Opposition at 13.) However, the Plaintiff offers no evidence to support this bald assertion and it remains mere speculation by the Plaintiff. The Plaintiff tries to bolster his allegation that Mr. Deshpande had discriminatory motives by asserting that "although [Mr. Deshpande] made numerous selections over the years, [he] had never selected an African–American for a high level position." (*Id.*) As an initial matter, this assertion is incorrect. Mr. Deshpande testified at his deposition that while he was Chief of the Internal Controls Section at the RTC, he made approximately eight or nine selections; one of these selections was of an African–American man for a G–14 position, who decided not to accept the job offer. (Reply at 16–17 and Opposition Ex. 20 at 63–64.) As the Director of OICM, Mr. Deshpande selected African–American candidates for seven of the twenty-five positions for which he was the selecting official. (Reply at 16–17 and Ex. 48 Defendant's Response to Plaintiff's Interrogatory No. 19.) Of those seven positions, two were Grade 7, two were Grade 8, one was Grade 11, and the other two were Grade 14. (*Id.*) In addition, Mr. Deshpande was the approving official in hiring four additional African–American candidates; two of these positions were Grade 7, one was Grade 9, and one was Grade 14. (*Id.*)

Pretermitting Plaintiff's apparently incorrect assertion, without evidentiary support or statistical evidence, it is insufficient to cast doubt on the legitimate, non-discriminatory reason offered by the Defendant. In order to create a presumption of discrimination, Plaintiff would need to demonstrate a gross statistical disparity between the number of qualified African–American applicants and the number of African–American candidates selected for positions. The mere assertion that no African–Americans were selected for highly graded positions is meaningless without the context of how many positions were available, how many qualified applicants applied for the positions, the number of qualified applicants of various racial groups, and the race of the selectees. *See, e.g., City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 501–502, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In sharp contrast, the Defendant provided detailed evidence regarding the selections Mr. Deshpande made or approved; this evidence clearly refutes the Plaintiff's unsupported assertion regarding Mr. Deshpande's discriminatory hiring practices.

(c) The Plaintiff Failed to Present Objective Evidence that His Qualifications for the Positions Are Sufficiently Superior to Give Rise to an Inference of Discrimination.

█ Finally, Plaintiff contends that he is so clearly the superior candidate that

an inference of discrimination arises from the mere fact that he was not selected. (Opposition at 13–14.) The Plaintiff argues that he was better qualified than the selectees and that an "honest comparison" of his application with the applications of the selectees will bear this out. (*Id.*) Where a plaintiff's qualifications are so vastly superior than the selectee's, this may be considered as evidence of pretext, casting doubt on the legitimate, non-discriminatory explanation offered by the employer and creating a question of material fact. *See, e.g., Fischbach v. District of Columbia Department of Corrections,* 86 F.3d 1180, 1183 (D.C.Cir.1996) ("Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination ... if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so.") (citations omitted). However, a plaintiff cannot satisfy his burden of demonstrating pretext "simply based on [his] own subjective assessment of [his] own performance." *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 7 (D.D.C.2000) (citing *Smith v. Chamber of Commerce of the United States,* 645 F.Supp. 604, 608 (D.D.C.1986)). As the D.C. Circuit has cautioned, Title VII "does not authorize a federal court to become a 'super-personnel department that reexamines an entity's business decisions.'" *Barbour v. Browner,* 181 F.3d 1342, 1346 (D.C.Cir.1999) (quoting *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)). Instead, where there is no evidence that an employer's offered reason is a pretext, then "the court must respect the employer's unfettered discretion to choose among qualified candidates." *Fischbach,* 86 F.3d at 1183.

Here, the Plaintiff offers only his subjective, unsupported assertion that he was the best candidate for the positions. The Plaintiff contends that an honest review of the selectees' applications and his application compels this conclusion. The Court disagrees. Unless disparities in qualifications "are so apparent as to virtually jump off the page and slap us in the face, we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty by virtue of their own years of experience and expertise." *Odom v. Frank,* 3 F.3d 839, 846 (5th Cir.1993). No such disparity exists in this case and in the context of the selection process followed by the Defendant, there is no evidence of discrimination. *See, e.g., Walker v. Dalton,* 94 F.Supp.2d 8, 16 (D.D.C.2000) (finding that "[i]n the absence of any other evidence that would allow a jury to infer that discrimination took place in a particular case, slight questions of comparative qualifications do not warrant a jury trial."); *Vasilevsky v. Reno,* 31 F.Supp.2d 143, 150 (D.D.C.1998) (concluding that plaintiff's arguments regarding "comparison of her qualifications with those of the selected candidates truly misses the point. It is the plaintiff's duty to put forth evidence of discrimination, not to 'quibble about the candidates' relative qualifications.'") (quoting *Skelton v. ACTION,* 668 F.Supp. 25, 26 (D.D.C.1987)).

Plaintiff also argues that the selection process is suspect because three of the four selectees had to relocate to the Washington, DC area. (Opposition at 6–7.) Plaintiff appears to argue that because he was the superior candidate and was already in the Washington, DC FDIC office, there was no legitimate basis for selecting a candidate who would have to relocate. (*Id.*) The Court finds no merit in this argument and concludes there is insufficient evidence to establish the Defendant's

proffered reasons as pretextual. An FDIC Memorandum from May 1996, established that FDIC Divisions and Office Directors were "authorized to approve relocations of professional employees [GG 5 through GG–15] . . . provided that such relocations are consistent with" staffing requirements and procedures. (*Id.* at Ex. 11 Memorandum to All Division and Office Directors from Dennis F. Greer, Deputy to the Chairman and Chief Operating Officer.) The memorandum advised Directors that they "should carefully consider . . . cost effectiveness" before approving a relocation. (*Id.*) Directors were required to obtain approval to relocate executives to areas which had an excess of permanent staff members for particular grades. (*Id.*)

 It appears from the record, that Mr. Deshpande, as the Director of OICM had the authority to make selections of applicants that required relocation. Plaintiff offers no evidence that the relocations were race-based and made to avoid considering him for the positions; nor does he offer any evidence that the same procedure was not followed for all OICM selections. In addition, even assuming that the relocations were made in contravention of an FDIC Memorandum, "[a]n employer's failure 'to follow its own regulations and procedures, *alone,* may not be sufficient to support' the conclusion that its explanation for the challenged employment action is pretextual." *Fischbach,* 86 F.3d at 1183 (quoting *Johnson v. Lehman,* 679 F.2d 918, 922 (D.C.Cir.1982)).

**B. The Plaintiff has Failed to Create a Triable Issue Regarding His Non–Selection for the Management Services Branch Position; Consequently, the Defendant is Entitled to Summary Judgment on this Claim.**

 Although the Plaintiff has established a *prima facie* case of discrimination with respect to the position of Chief, Review and Visitation Section in the Management Services Branch, the Defendant has offered a legitimate, non-discriminatory reason for selecting a different candidate and the Plaintiff has not satisfied his burden of demonstrating this reason is pretextual. Mr. Cherry, the selecting official for this position, explained his selection process in great detail and provided ample support for his decision to select Mr. Keefer for the position. (*See* Section I.C., *supra,* at page 87.)

The Plaintiff argues that the reasons offered by Mr. Cherry for selecting Mr. Keefer rather than the Plaintiff for the position are pretextual. (Opposition at 17–21.) In support of his argument, the Plaintiff cites *Aka v. Washington Hospital Center,* 156 F.3d 1284 (D.C.Cir.1998) (*en banc*). In *Aka,* the plaintiff, who worked as an orderly at a hospital for nineteen years, sued his employer under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq. Id.* at 1286. After heart bypass surgery, the plaintiff could no longer perform his duties as an orderly and he sought another position at the hospital which was compatible with his medical condition. *Id.* The hospital denied him a transfer, but granted him a job search leave. *Id.* The governing collective bargaining agreement, entitled employees to preferential treatment over non-hospital employees and gave additional preference to employees with greater seniority; however, the plaintiff was rejected for every position for which he applied. *Id.* at 1286–87. The employer defended its decision to select another candidate by citing the selectee's experience, knowledge of terminology, and enthusiasm. *Id.* at 1296–99. However, the record evidence did not support these claims. The D.C. Circuit concluded that there was sufficient evidence

for a jury to conclude that the plaintiff was substantially more qualified than the selectee with at least an equal knowledge of terminology. *Id.* at 1299–1300. In addition, the Court considered with skepticism, the employer's claim that the selectee was more enthusiastic about the position. *Id.* at 1297–98. First, the interviewer did not note this lack of enthusiasm on her interview sheet after meeting with the plaintiff despite her claim that this was an important factor in the decision. *Id.* at 1298. Second, the Court explained that courts consider reasons that rely heavily on subjective criteria, like "enthusiasm," with caution. *Id.* This is particularly true where the surrounding evidence permits a finding that the plaintiff is substantially better qualified than the selectee because this may indicate underlying discrimination. *Id.* In this context, the Court found that the plaintiff had presented enough evidence to survive summary judgment.

The instant case is clearly distinguishable from *Aka.* To begin with, there is no evidence that the Plaintiff is substantially more qualified that Mr. Keefer who was selected for the position. The Plaintiff contends that Mr. Cherry's reliance on the candidates' "communication skills" in selecting an applicant for the position was highly subjective and masked discrimination. (Opposition at 17–19.) The Plaintiff misreads the holding of *Aka,* which recommends a cautious approach to employers' explanations based on subjective criteria, but emphasizes the background evidence that Mr. Aka was substantially more qualified than the selectee. *Aka,* 156 F.3d at 1298. In addition, Mr. Cherry provided a detailed explanation of how the selectee's communication skills were better than the Plaintiff's skills and how this related to the requirements of the position. (*See* Section I.C., *supra,* at 88.) For example, Mr. Cherry stated that success in the position required superior communication skills be-

cause the selectee would perform the role of an auditor and consultant to the division in an effective, but non-threatening way in order to evaluate the controls and weaknesses of the division. (Motion at 11 and Ex. 3 Cherry Aff. at 4.) Based on Mr. Cherry's experience working with the Plaintiff, he stated that the Plaintiff had failed to keep him adequately informed about his work while he was detailed at OICM. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5.) In addition, the Plaintiff did not always provide the necessary context for the issues on which he was reporting. (*Id.* at 21 and Ex. 3 Cherry Aff. at 5–6.) This detailed explanation is substantially different from the vague remarks about an applicant's enthusiasm. In this context, the Court rejects the Plaintiff's contention that the Defendant's reliance on communication skills is evidence of pretext.

Similar to his arguments regarding the positions at OICM, the Plaintiff contends that he was the objectively superior candidate for the MSB position. (Opposition at 17–19.) As set forth above, it is not the role of the court to play the role of a super-personnel department, second-guessing an employer's personnel decisions. *See, e.g., Barbour,* 181 F.3d at 1342; *Fischbach,* 86 F.3d at 1183. Instead, this Court "must respect [the Defendant's] unfettered discretion to choose among qualified candidates." *Fischbach,* 86 F.3d at 1183. The Plaintiff's unsupported assertion that he is the superior candidate and that he would have been selected had the process been free from discrimination is insufficient to avoid summary judgment.

## IV. CONCLUSION

As set forth above, the Plaintiff has established a *prima facie* case of race discrimination. In response, the Defendant has offered legitimate, non-discriminatory reasons for its personnel action. The

Plaintiff has failed to offer evidence demonstrating that the reasons offered by the Defendant are not the true reasons, but are a pretext for discrimination which would warrant submission of this case to a jury. In fact, the Plaintiff has failed to cast any doubt on the legitimate reasons offered by the Defendant. Therefore, there under the *McDonnell Douglas* framework applicable to Title VII cases, the Defendant is entitled to summary judgment.

### *ORDER*

UPON CONSIDERATION of Defendant's Motion for Summary Judgment [35, 37], Plaintiff's Opposition to Defendant's Motion for Summary Judgment [46], Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment [49], and Plaintiff's Sur–Reply to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment [52], the parties' oral arguments, and for the reasons set forth in the accompanying Memorandum Opinion, it is this —— day of June 2003, hereby

**ORDERED** that Defendant's Motion for Summary Judgment [35, 37] is **GRANTED.** It is further

**ORDERED** that this case is **DISMISSED with prejudice.**